Opinion issued June 16, 2011



In The

Court of
Appeals

For The

First District
of Texas

————————————

NO. 01-11-00023-CV

———————————

In re R.W., E.W., and B.W.

Mother, Appellant 



 



 

On Appeal from the 314th District Court  

Harris County, Texas



Trial Court Case No. 2009-04633J

 



 

MEMORANDUM OPINION

          In
this accelerated appeal, a mother challenges the trial court’s decree
terminating her parental rights to her minor children, R.W., E.W., and B.W.,
and naming the Department of Family and Protective Services (“the Department”)
as the children’s sole managing conservator. 
The mother contends that the evidence is legally and factually
insufficient to support the trial court’s termination findings under section
161.001.  See Tex. Fam. Code Ann. § 161.001 (West Supp. 2010).  She further contends that the evidence is
legally and factually insufficient to support the appointment of the Department
as the sole managing conservator of the children.  We hold that the evidence is factually
insufficient to support the trial court’s best interest finding under section
161.001, but that the evidence is sufficient to support the appointment of the
Department as the sole managing conservator. 
We therefore reverse the trial court’s judgment terminating the mother’s
parental rights and remand for a new trial, but affirm the judgment of
conservatorship of R.W., E.W., and B.W.

Background

In September 2008, the
Department received a complaint that the mother was neglecting her three
children, who were all under the age of three. 
Tanya Dehart-Clark, a caseworker at the Department’s Family Based
Services, investigated the complaint. 
She found the mother’s residence to be very hazardous to the children.  According to Dehart-Clark, things were
everywhere, animal urine and feces covered the floor, and an unknown substance
covered the place where the children ate. 
The children were dirty, had colds, and ran around “with no shoes,
nothing on.”  Dehart-Clark observed that
the children appeared otherwise healthy and exhibited no signs of physical
abuse.  She stated that the mother was in
an abusive relationship with her husband, who is the father of R.W., E.W.,
and B.W.[1]  Dehart-Clark stated that the mother had been
diagnosed as bipolar and had told Dehart-Clark that she took medication.  Neither the mother nor the father was employed
at the time.  

After Dehart-Clark’s visit, the
Department provided the mother with homemaker services to make her residence
suitable for children, and with daycare services.  The mother used the homemaker services one
time, but refused to answer the phone or door when a representative from the
homemaker services attempted to provide her with further help.  Subsequently, the children’s daycare sent the
Department a letter which stated that the children had bumps, bruises, and scratches.  The daycare also said that the children had
to be bathed and given a change of clothes each day when they arrived because
they came dirty to the daycare.  The
Department attempted to place the children with the mother’s aunt.  Under the aunt’s care, the children’s
condition did not improve, and they continued to come dirty to the daycare.  The Department then petitioned the trial
court for custody of the children.  In
June 2009, the trial court granted temporary managing conservatorship of the
children to the Department.     

In August 2009, Tammie
Flye, a caseworker at Child Protective Services, developed a family service
plan for the mother to obtain the return of her children.  The Department filed the plan with the trial
court.  The trial court signed additional
orders that the mother was to complete to obtain the return of her children.  The orders required the mother (1) to
complete substance abuse program, (2) to complete a psychological evaluation
and follow all recommendations, (3) to participate in counseling, (4) to
complete parenting classes, (5) to complete a drug and alcohol assessment and
follow all recommendations, (6) to complete random drug tests, (7) to remain
drug free, (8) to refrain from engaging in criminal activity, (9) to maintain
stable housing, (10) to maintain stable employment, and (11) to complete all
additional services outlined in the family service plan.  The family service plan had substantially
similar requirements for the mother to complete as those in the trial court’s
orders.  In addition, the service plan
specifically required the mother (1) to participate in individual counseling;
(2) to complete domestic violence classes, (3) to provide a signed lease
agreement to verify stable housing for at least six months, and (4) to provide
pay-stubs to verify employment for at least six months.  The target date for completion of the service
plan was July 31, 2010.   

Flye set up services
for the mother on two occasions so that the mother could comply with some of
the requirements of the service plan and the orders of the trial court.  The Department paid for the services.  On both occasions, the mother did not respond
to the service providers’ phone calls, nor did she show up for appointments
with the service providers.  After these
two failed attempts, the Department continued to try to help the mother obtain
services, but no longer paid for them. 
According to Flye, the mother never used the services.  The mother told Flye that she was not using
the services because her husband would not allow her to use them.  In February 2010, the husband moved to
Wisconsin.  That same month, the mother
moved into the house of her boyfriend, Jason McDaniel.  The mother did not provide the Department
with a lease agreement or proof of any contributions indicating that she was
residing at Jason’s house.  According to
Flye, the mother did not attend any domestic violence classes, and she refused
on more than one occasion to submit to a drug test that the Department had set
up.  Flye testified that the Department
considered a refusal to take a drug test to be a positive result.  She was not aware of any actual positive
tests.  The mother has never been
arrested or charged with any crime.  In
August 2010, past the one year deadline for completion of the family service
plan, the mother began attending parenting classes, but she failed to complete
them.  She completed five of the eight
parenting classes.    

In September 2010,
Tyesha Jacobs became the caseworker assigned to the mother’s case.  Jacobs stated that, during her time as the
caseworker, the mother failed to complete any of the requirements ordered by
the trial court.  According to Jacobs,
the mother stated that she was employed at Wal-Mart, but that she had to leave
that job because she could not provide the employer with a valid Texas
identification card.  The mother never
provided pay-stubs from Wal-Mart to the Department.  In October 2010, the mother refused to submit
to a random drug test.  Both Jacobs and
Flye sat down with the mother a number of times to explain to her exactly what
she needed to do to obtain the return of her children.  Jacobs said that the mother had called her
more than twenty times at the Department. 
She added that the mother did not call regularly, but, on the days she
phoned, she called many times.  Jacobs
returned two or three phone calls to the mother.             

Due to the mother’s
lack of compliance with the service plan and the trial court’s orders, the
Department petitioned to have the mother’s parental rights terminated.  In November 2010, the trial court conducted a
bench trial on the Department’s parental-termination suit.  At the beginning of trial, the Department
asked the court to take judicial notice of its prior orders in the case
including additional temporary orders, ordering the family service plan.  The trial court took judicial notice of the
orders.    

During the trial, the
mother offered a diagnostic review form from Tri-County MHMR dated August 2010.  The document indicated that the mother had a
mixed anxiety disorder.  The mother
testified that the separation from her children caused her anxiety.  She stated that she was not diagnosed with
other mental health problems and was not prescribed any medication.  She submitted the form to the
Department.  

The mother testified
that when the Department originally came to her house, she was going through a
rough time.  She maintained that her
situation had changed when she moved in with her boyfriend, Jason, in February
2010.  She was then in a stable
environment.  She testified that she
intended to live with the children at Jason’s house, which his father, Jeff
McDaniel, owned.  Jason agreed to help
her raise the children.  According to the
mother, she and Jason were engaged to be married.  She had no intention to reunite with her
husband.  She admitted that she was still
legally married to him, but said that he had filed for divorce in
Wisconsin.  The husband had not served
her with divorce papers.  She testified
that she had visited her children since the Department took custody of them.  According to the mother, these visits went
great.  The children called her “mama,”
and they were upset at the end of the visits. 
One time, R.V. held onto her, crying that he did not want her to
leave.  The mother said that if she
received custody of her children, she would be a better mother.                       

The mother testified
that she understood that she had to meet the conditions of the service plan.  On cross examination, the Department asked
the mother if she participated in individual counseling.  She responded that she was not aware the
service plan required her to do that. 
The Department asked her if she did domestic violence counseling.  She responded that she went to counseling
every Wednesday, but had not yet gotten the paperwork to verify her attendance.  The Department asked her if she underwent a
substance abuse assessment.  She
responded that she went to AA meetings every Thursday because she thought it
constituted substance abuse assessment. 
She acknowledged that the Department had made multiple referrals for her
to receive a substance abuse assessment, but she said her husband would not
take her, and she did not know how to drive their car which had a stick-shift
transmission.  The mother admitted that
she had completed none of the requirements of the family service plan.  She testified that she is a high-school
graduate.        

Jason, the mother’s
boyfriend, testified that he planned to marry the mother. He has known the
mother since 2001 when the two were in high school together.  He said that he had never been arrested.  He stated that his father would allow him to
live at the house his father owned as long as he wanted.  Jason further testified that he has been an
employee at his father’s company for thirteen years.  He received a salary of $3,100 a month plus
benefits and health care coverage.  He
said that he could put the mother’s children on his health care plan.  He stated that he is financially able and
willing to support the mother and her children. 
He testified that he was waiting till the end of the month to file for
divorce from the father on the mother’s behalf. 
Jason’s father, Jeff, also testified. 
He said that the house where the mother and Jason were living was clean
and suitable for children.  He gave the
mother and Jason permission to stay at the house as long they needed to raise
the children.  He said he would act as a
grandparent to the children and treat them like his family.            

As of the time of the
trial, the children were ages three, four and five.  They were in three separate foster care
placements.  These were not adoptive
placements.  The Department was seeking
adoptive homes for the children.  The
Department’s goal was to place all three children in one home, but that had not
occurred by the time of trial.  Jacobs,
the current caseworker, testified that it was possible that the children would
be adopted but she did not know if they would be adopted together.  Jacobs stated that B.W., the youngest, was
doing very well in his placement.  He was
independent, capable of dressing himself and was potty-trained.  The older children, R.W. and E.W., had
behavioral issues in their placements and at school.  Both children have ADHD and take medication
to treat it.  Jacobs testified that this
was due to “learned behavior” resulting from a lack of supervision when they
were with the mother, but later admitted that it was possible that their
behavioral problems could result from their separation from the mother.  Jacobs testified that foster care would be a
safer and more stable placement for the children.  Flye, the original caseworker, testified that
the mother was unstable because she was unemployed and had no independent means
to support her children.  Flye stated
that the mother had no answer when Flye asked her what she would do to support
her children if Jason told her to leave his house.  Flye testified that because the mother was
mentally unstable she could not provide a stable environment for her
children.  

During closing
argument, the attorney ad litem representing the children stated that he had
seen photos of Jason’s house, where the mother currently resides, and it
appeared to be clean and in a nice neighborhood.  He nevertheless concluded termination of the
mother’s rights was “probably” in the best interest of the children given that
the mother failed to do what the Department required. 

In December 2010, the
trial court signed a judgment terminating the mother’s parent-child
relationship with R.W., E.W., and B.W. and appointing the Department as the
children’s sole managing conservator. 
The trial court found by clear and convincing evidence that: (1) the
termination of the mother’s parental relationship was in the best interest of
the children; (2) the mother knowingly placed or allowed the children to remain
in conditions or surroundings which endangered the physical or emotional
well-being of the children, and (3) the mother failed to comply with the
provisions of a court order that specifically established the actions necessary
for her to obtain the return of her children. 
The mother filed a motion for new trial and a statement of appellate
points.  The trial court denied the
mother’s motion for new trial and found that her appeal was not frivolous.  See Tex. Fam. Code Ann. § 263.405(d) (West
Supp. 2010). 

Termination of Parental Rights

          The
mother challenges the legal and factual sufficiency of the evidence supporting
the court’s findings that (1) she failed to comply with the provisions of a
court order establishing the actions necessary for her to obtain the return of
her children, (2) she knowingly placed or allowed the children to remain in
conditions which endangered the children’s physical or emotional well-being,
and (3) the termination of her parental rights was in the best interest of the
children.   

Standard of Review 

In order to terminate parental rights under section 161.001
of the Family Code, the petitioner must establish that the parent engaged in
conduct enumerated in one or more of the subsections of section 161.001(1) and
must also show that termination of the parent-child relationship is in the best
interest of the child.  Tex. Fam. Code Ann. § 161.001; Richardson
v. Green, 677 S.W.2d 497,
499 (Tex. 1984).  The petitioner must
prove both prongs and may not rely solely on a determination that termination
is in the best interest of the child.  Tex. Fam. Code Ann. § 161.001; Tex.
Dep't of Human Servs. v. Boyd,
727 S.W.2d 531, 533 (Tex. 1987).  “Only
one predicate finding under section 161.001(1) is necessary to support a
judgment of termination when there is also a finding that termination is in the
child’s best interest.”  In re A .V., 113 S.W.3d 355, 362 (Tex. 2003).

It is well-established that parental
rights are of constitutional dimension and are “far more precious than property
rights.”  Holick v. Smith, 685 S.W.2d 18, 20 (Tex. 1985) (quoting
Stanley v. Illinois, 405
U.S. 645, 651, 92 S. Ct. 1208, 1212 (1976)). 
Because of the great importance of parental rights, grounds for
termination must be supported by clear and convincing evidence rather than a
mere preponderance.  Tex. Fam. Code Ann. § 161.001; In re
C.H., 89 S.W.3d 17, 23
(Tex. 2002).  Clear and convincing
evidence refers to a degree of proof that will produce in the mind of the
factfinder a firm belief or conviction as to the truth of the allegations
sought to be proved.  In re C.H., 89 S.W.3d at 25.  This intermediate standard falls between the
preponderance standard of ordinary civil proceedings and the reasonable doubt
standard of criminal proceedings.  State
v. Addington, 588 S.W.2d
569, 570 (Tex. 1979).  While the proof
must be more than merely the greater weight of the credible evidence, there is
no requirement that the evidence be unequivocal or undisputed.  Id.  Termination proceedings should be strictly
scrutinized, and involuntary termination statutes are strictly construed in
favor of the parent.  Holick, 685 S.W.2d at 20–21. 

When reviewing the legal sufficiency of
the evidence in a case involving termination of parental rights, we determine
whether the evidence is such that a factfinder could reasonably form a belief
or conviction that there existed grounds for termination under § 161.001(1) and
that termination was in the best interest of the children.  See Tex.
Fam. Code Ann. § 161.001(1), (2); In re J .F.C., 96 S.W.3d 256, 266 (Tex.
2002).  In doing so, we examine all
evidence in the light most favorable to the finding, assuming that the
“factfinder resolved disputed facts in favor of its finding if a reasonable
factfinder could do so.”  In re J.F.C., 96 S.W.3d at 266.  We must also disregard all evidence that the
factfinder could have reasonably disbelieved or found to be incredible.  Id.  However, we must not disregard all of the evidence
that does not support the finding, as doing so could “skew the analysis of
whether there is clear and convincing evidence.”  Id.

When conducting a factual sufficiency
review of the evidence in a termination of parental rights case, we examine the
entire record to determine whether “the disputed evidence that a reasonable
factfinder could not have credited in favor of the finding is so significant
that a factfinder could not reasonably have formed a firm belief or
conviction,” that the two prongs of section 161.001 were met.  See Tex.
Fam. Code Ann. § 161.001; In re J.F.C., 96 S.W.3d at 266.  If the evidence that could not be credited in
favor of the finding is so great that it would prevent a reasonable factfinder
from forming a firm belief or conviction that either termination was not in the
best interest of the child, or none of the grounds under section 161 .001(1) was
proven, the evidence will be factually insufficient and the termination will be
reversed.  See Tex. Fam. Code Ann. § 161.001; In re
J.F.C., 96 S.W.3d at 266.

Texas Family Code section
161.001(1)(O)-Failure to Comply with Court Order 

The mother asserts that the evidence is insufficient to
support termination under section 161.001(1)(O) because the Department never
admitted into evidence the trial court’s order setting forth the actions
necessary for the mother to obtain the return of her children, and the trial court
never took judicial notice of the order. 
The mother concludes that the Department therefore did not comply with section 161.001(1)(O).  

In order for a court to terminate parental rights under
section 161.001(1)(O), the court must find by clear and convincing evidence
that the parent “failed to comply with the provisions of a court order that
specifically established the actions necessary for the parent to obtain the
return of the child who has been in the permanent or temporary managing
conservatorship of the Department of Family and Protective Services for not
less than nine months as a result of the child’s removal from the parent under
Chapter 262 for the abuse or neglect of the child.”  Tex.
Fam. Code Ann. § 161.001(1)(O) (West Supp. 2010).  

A trial court may take judicial notice
of its own records in matters that are generally known, easily proven, and not
reasonably disputed.  Trimble v. Tex. Dep’t. of Protective &
Regulatory Servs., 981 S.W.2d 211, 215 (Tex. App.—Houston [14th Dist.]
1998, no pet.); see also Tex. R. Evid. 201.  “A court may take judicial notice, whether
requested or not.”  Tex. R. Evid. 201(c).  But when the court takes judicial notice, it
must notify the parties and give them an opportunity to challenge that
decision.  See Tex. R. Evid. 201(e).  

The mother relies on In re C.L., where our sister court held
that the evidence was legally insufficient to support termination under 161.001(1)(O)
because no evidence existed of the trial court’s order setting forth the
actions necessary for the parent to obtain the return of her children.  304 S.W.3d 512, 517 (Tex. App.—Waco 2009,
no pet.).  There, the court held that the
trial court did not take judicial notice of its prior orders in its file,
including the one requiring a family service plan, because the Department did
not ask the trial court to take notice of them, and the court did not announce
that it was taking notice.  Id. at 516.  Here, in contrast, the
Department requested the court to take judicial notice of its prior orders in
the case—and, specifically, the order requiring that the mother to comply with
the family service plan.  The trial court
announced that it was taking judicial notice of the orders.  The mother did not challenge its
decision.  Accordingly, the trial record
contains the order that established the actions necessary for the
mother to obtain the return of her children as 161.001(1)(O) requires.  See Trimble, 981 S.W.2d at 215; see also Tex. R. Evid. 201.

The mother further asserts that the
evidence is insufficient to support termination under section 161.001(1)(O)
because the mother was in an abusive relationship with her husband, who would
not allow her to obtain the services necessary to complete the family service
plan.  The mother’s response that her failure to comply was due to
her abusive relationship with her husband is unavailing.  

We note that the Family Code does not
excuse a failure to comply in assessing whether a violation of section
161.001(1)(O) has occurred.  See In re M.C.G., 329 S.W.3d 674, 675–76
(Tex. App.—Houston [14th Dist.] 2010, pet. denied); see also In re J.S., 291 S.W.3d 60, 67 (Tex.
App.—Eastland 2009, no pet.); Wilson v. State, 116 S.W.3d 923, 929 (Tex. App.—Dallas 2003, no pet.).   But, any excuse for failing to complete a
family services plan can be considered part of the best interest
determination.  See In re T.N.F., 205 S.W.3d 625, 631 (Tex. App.—Waco
2006, pet. denied); see also Holley v. Adams, 544 S.W.2d 367, 371 (Tex. 1976); In the Interest of S.K.S., 648 S.W.2d 402, 404 (Tex. App.—San
Antonio 1983, no writ).  Importantly, the
abusive relationship with her husband does not account for the mother’s
non-compliance during the period after her husband moved to Wisconsin. 
Her husband moved to Wisconsin in February 2010, and his relationship
with the mother ended.  The
trial court conducted a bench trial on the Department’s parental-termination
suit in November 2010.  From February
2010 till November 2010, the mother continued to not comply with trial court’s
orders.  For example, in October 2010,
the mother refused to submit to a random drug test.  The mother responds that she tried her best
to comply with the court’s orders after her husband left.  She completed most of her parenting classes
and supposedly attended AA and domestic violence classes.  The Family Code, however, does not provide for substantial
compliance with a family services plan.  See
In re M.C.G., 329 S.W.3d at
676.  

The mother
does not dispute that the children were in the custody of the Department for
nine months or that the Department removed the children because of abuse or
neglect after it made attempts to offer her social services.  In addition, undisputed testimony from the
caseworkers and the mother establishes that she did not comply with most, if
not all, of the requirements ordered by the court.  Specifically, the mother failed to maintain
stable employment, to submit to random drug tests on a number of occasions, to
participate in individual counseling, to complete a drug and alcohol
assessment, to complete parenting classes, and to complete domestic violence
classes.  Viewing the entire record, we conclude that the trial court
could have formed a firm belief or conviction that the mother failed to comply
with the provisions of a court order that established the actions necessary for
her to obtain the return of her children. 
See Tex. Fam. Code
Ann.    § 161.001(1)(O); see also In re J.F.C., 96 S.W.3d at 266.  Accordingly, we hold that the evidence is
legally and factually sufficient to support the court’s finding on this ground.[2]

Best Interest of the Children

The mother challenges the legal and factual sufficiency of
the trial court’s finding, pursuant to section 161.002(2), that termination was
in her children’s best interest.  See Tex.
Fam. Code Ann. § 161.001(2) (West Supp. 2010).

A strong presumption exists that a child’s best interests
are served by maintaining the parent-child relationship.  In re L.M., 104 S.W.3d 642, 647 (Tex. App.—Houston [1st Dist.] 2003, no
pet.).   The Department has the burden to
prove by clear and convincing evidence that termination is in the children’s
best interest.  In the Interest of G.M., 596 S.W.2d 846, 847 (Tex. 1980).  The
same evidence of acts or omissions used to establish grounds for termination
under section 161.001(1) may be probative in determining the best interests of
the child.  In re C.H., 89 S.W.3d 17, 28 (Tex. 2002); In re L.M., 104 S.W.3d at 647.  In Holley v. Adams, the Texas Supreme Court provided a
nonexclusive list of factors that the trier of fact in a termination case may
use in determining the best interest of the child.  544 S.W.2d at 371–72.  These factors include (1) the desires of the
child; (2) the emotional and physical needs of
the child now and in the future; (3) the emotional and physical danger to the
child now and in the future; (4) the parental abilities of the individuals
seeking custody; (5) the programs available to assist these individuals to
promote the best interest of the child; (6) the plans for the child by these
individuals or by the agency seeking custody; (7) the stability of the home or
proposed placement; (8) the acts or omissions of the parent that may indicate
that the existing parent-child relationship is not a proper one; and (9) any
excuse for the acts or omissions of the parent. 
Id.  These factors are not
exhaustive, and there is no requirement that the Department prove all factors
as a condition precedent to parental termination.  In re C.H., 89 S.W.3d at 27; Adams v. Tex. Dep't of Family &
Protective Servs., 236
S.W.3d 271, 280 (Tex. App.—Houston [1st Dist.] 2007, no pet.).  Termination of the parent-child relationship
is not justified when the evidence shows that a parent’s failure to provide a
more desirable degree of care and support of the child is due solely to
misfortune or the lack of intelligence or training, and not to indifference or
malice.  Clark v. Dearen, 715 S.W.2d 364, 367 (Tex.
App.—Houston [1st Dist.] 1986, no writ). 


For legal sufficiency purposes, we consider those factors
that support the finding that termination was in the child’s best
interest.  Yonko v. Dep't of Family & Protective Servs, 196 S.W.3d 236,
243 (Tex. App.—Houston [1st Dist.] 2006, no pet.).  We then balance the factors presented in the
legal sufficiency argument against the evidence that undercuts any finding that
termination is justified under the statute. 
In re C.T.E., 95
S.W.3d 462, 467 (Tex. App.—Houston [1st Dist.] 2002, pet. denied).  A court of appeals should consider whether
disputed evidence is such that a reasonable factfinder could not have resolved
that disputed evidence in favor of its finding. 
In re J.F.C., 96
S.W.3d at 266.  If, in light of the
entire record, the disputed evidence that weighs against termination is so
significant that a factfinder could not reasonably have formed a firm belief or
conviction that termination was justified, then the evidence is factually
insufficient to support termination.  Id.  A court of appeals should detail in its
opinion why it has concluded that a reasonable factfinder could not have
credited disputed evidence in favor of termination.  Id. at 266–67.

The mother’s acts or omissions 

When the mother was
responsible for the children, she allowed them to live in unsanitary
conditions.  Under the mother’s care, the
children’s residence had animal urine and feces covering the floor.  On one occasion, Dehart-Clark observed that
the children were dirty and without shoes or clothes.  She stated that other than being dirty the
children appeared healthy and exhibited no signs of physical abuse.  The children’s daycare reported that the
children had to be cleaned and changed each day when they arrived.  Since 2008, the mother has never had stable
employment.  She currently lives with her
boyfriend, in what appears to be a clean house, but has no legal right to
reside there.  When the caseworker asked
the mother what she would do to provide for her children if her boyfriend asked
her to leave his home, she did not have an answer.  She failed to comply with the conditions in
the family service plan and court orders even after the Department explained to
her that it was necessary for her to complete these requirements to obtain the
return of her children.  The mother’s
acts or omissions are some evidence that termination is in the children’s best
interest.    

Programs
available to assist the mother 

There is evidence in the record that since 2008, the mother
has disregarded the Department’s attempts to assist her.  When the Department found her house to be
hazardous to the health of her children, it offered her homemaker’s
services.  The mother used the services
one time and then refused to answer phone calls or the door when a
representative attempted to help further. 
The mother’s initial caseworker twice set up services for her so that
she could complete her family service plan. 
The mother failed to attend her appointments and to answer the service
providers’ phone calls.  The mother
attended parenting classes, but failed to complete the course.  

Any
excuse for the mother’s acts or omissions 

The mother explained
that she was going through a “rough time” when the Department initially found
her house in disorder.  She was in an
abusive relationship with her husband. 
The mother told the original caseworker that she was not using the
services offered by the Department because her husband would not allow her to
use them.  The mother testified that her
husband would not take her to the services, and she did not know how to drive
their car.  The mother testified that she
is now in a stable environment because of her boyfriend, Jason.  Since her husband left, she has partially
completed parenting classes and gotten a psychological evaluation, and she
stated that she attends domestic violence and AA meetings.  She did not, however, provide documentation
of the domestic violence counseling or AA meetings to the Department.  She offered no evidence to excuse her failure
to complete the family service plan and the court’s orders in the months after
her husband’s departure.  This factor
weighs against termination because the mother offered some excuse for her failure,
and has made some effort to improve the living situation for her children.         

The
mother’s parental abilities

Since the Department took custody of her children, the
mother has visited them and called the Department over twenty times to check on
them.  She has partially completed
parenting classes.  Jason and his father
testified on behalf of the mother, and have agreed to help the mother in
raising the children.  The mother has
never been charged with a crime.  The
mother stated that she has an anxiety disorder because of the separation from
her children.  She testified that she has
no other mental health issues.  She
offered a copy of a psychological assessment to substantiate her claim.  She has completed the twelfth grade.  The mother’s past neglect of the children,
lack of her own residence, and continued unemployment weigh in favor of
termination, but the efforts she has made since leaving an abusive relationship
weigh against it.  

Desires
of the children 

At the time of the trial, the children were too young to
express with whom they desired to live. 
According to the mother, the children refer to her as “mama.”  The mother testified that her visits with the
children have been “great,” and the children were
“upset” at the end of the visits.  Her
oldest child cried the last time that she visited him, and he did not want her
to leave.  The mother loves her children,
and they are bonded to her.  The
Department presented no evidence that the children have bonded with their
foster parents.  This factor weighs
against termination.  See
Yonko, 196 S.W.3d at 245
(“We agree that the child’s desire to remain with a parent is only one factor
to consider among many, but love for a parent cannot be ignored as a reflection
of the parent's ability to provide for the child’s emotional needs.  Where the evidence of the parent's failures
is not overwhelming, the desires of the child weigh against termination of
parental rights.”).  

 

Plans for the children 

The mother plans to live with the
children at Jason’s house.  The mother
and Jason intend to marry and raise the children together, and Jeff wants to
act as their grandfather.  Both Jason and
Jeff testified to their agreement with this plan.  The Department’s goal
is to place all three children in one adoptive home, but that goal has not been
met, nor is there any evidence that indicates it is possible.  The current caseworker testified that it was
possible that the children could be adopted, but she did not know if they would
be adopted together.  As of trial, the
children were in three separate foster-care placements.  

Stability
of the home or proposed placement

The mother contends that Jason’s home is a stable
environment for her children.  As of
trial, the mother had lived with Jason for about nine months.  Jason’s father testified that the house was
clean and suitable for children.  He
added that he would allow the mother and Jason to live in the house as long as
they wanted.  The attorney ad litem also
observed that the house appeared clean and in a good neighborhood.  Jason has been gainfully employed for
thirteen years.  He stated he is able and
willing to support the mother and her children. 
The mother has no legal right to remain at Jason’s house, and Jason has
no legal obligation to support the children. 
The mother is unemployed and remains legally married to her
husband.  As stated, the children are in
separate foster-placements, awaiting likely separate adoptive placements.  

Emotional
and physical needs of
the children 

The
caseworker testified that the youngest child was doing very well in his
placement and was independent, while the two older children had behavioral
problems.  The older children both have
ADHD and require medication to treat it. 
They have had behavioral problems in their foster placements.  The bond between the children and the mother
indicates that the mother was providing for their emotional needs, and that
their emotional well-being in the future is dependent upon maintaining a
relationship with their mother.  See
Yonko, 196 S.W.3d at
245.  The mother, however, allowed her
children to be in unsanitary conditions in the past.  Other than being
dirty, the children appeared healthy and exhibited no signs of physical abuse. 
The need for permanence is also the paramount consideration for the
child’s present and future physical and emotional needs.  The goal of establishing a stable, permanent
home for a child is a compelling interest of the government.  In re S.H.A., 728 S.W.2d 73, 92 (Tex. App.—Dallas 1987, writ ref’d
n.r.e.).  Neither the mother nor the
Department has established a stable, permanent home for the children.  

 

 

Analysis 

The discussion of the Holley factors above shows some evidence
that termination is in the children’s best interest: the mother’s neglect; an
abusive relationship with her current husband; refusal to submit to random drug
tests; lack of housing or employment, and a failure of less drastic measures to
improve the children’s situation.  Therefore,
viewing the evidence is a light favorable to the trial court’s findings, we
conclude that it could have formed a firm belief or conviction that it was in
the children’s best interest to terminate the mother’s parental rights.  See In
re J.F.C., 96 S.W.3d at 266.  

Given the strong presumption that a
child’s best interests are served by maintaining the parent-child relationship
and the high evidentiary standard that the Department must meet, however, we
hold that the evidence is factually insufficient to support termination.  We find that this case is one where
appellant’s offending behavior is not egregious enough, on its own, to warrant
a finding that termination is in the children’s best interest.  The mother allowed her children to live in
unsanitary conditions and neglected their physical hygiene.  “Although it is true that unsanitary conditions
can qualify as surroundings that endanger a child, it is also true that most
cases upholding termination of parental rights based on unsanitary home
conditions do
not uphold the termination findings solely based on these unsanitary
conditions.”  In re J.R., 171 S.W.3d 558, 573–74 (Tex. App.—Houston [14th Dist.]
2005, no pet.).  In In re M.C., for example, the Texas Supreme
Court concluded that, under the former standard of review, the evidence of
unsanitary conditions was legally and factually sufficient to terminate a
mother’s parental rights.  917 S.W.2d
268, 269–70 (Tex. 1996).  This conclusion
was based on evidence of “extraordinarily unsanitary conditions” in addition to
evidence that on at least two occasions the mother left the children alone in
potentially dangerous conditions.  See
id.  According to testimony, the children’s
home was infested with roaches, the children ate food off the floor and out of
the garbage, and the floor and furniture were littered with food, dirty
clothes, garbage, and feces.  Id.  The children often wore soiled diapers
and clothes, and sometimes had dried food, feces, and mucus on their skin and
clothes.  Id.  One of the children had dead cockroaches
matted in her hair, and another infant had dead roaches inside her bottle.  Id. 
During one summer, the mother moved the family into a house that lacked
plumbing or drinking water, and the children were found suffering from severe
diarrhea and vomiting.  Id.; cf. In re J.R., 171
S.W.3d at 573–74 (holding that evidence of unsanitary conditions was legally
insufficient to terminate parental rights despite evidence of “deplorable”
trailer in which knife was on bathroom floor, toilet bowl was completely brown,
bags of trash, dirty dishes, and spoiled food were scattered throughout
kitchen, and the children had ringworm, flea bites and were very thin); Doyle
v. Tex. Dep’t of Protective & Regulatory Servs., 16 S.W.3d 390, 394–95 (Tex. App.—El Paso 2000, pet. denied)
(holding that evidence of unsanitary conditions was legally insufficient to
terminate parental rights despite evidence that apartment in which children
lived was roach-infested); In re P.S., 766 S.W.2d 833, 836–38 (Tex. App.—Houston [1st Dist.] 1989, no
writ) (holding that evidence of unsanitary conditions was legally insufficient
to terminate parental rights despite evidence of “deplorable” apartment in
which dirty diapers and soiled clothing were scattered throughout, kitchen sink
was filled with dirty dishes, garbage was all over, refrigerator was virtually
empty, and environment was generally unkempt and unclean).  

The evidence adduced at trial
does not rise to same level as the facts in In re M.C.  When Dehart-Clark initially visited the
mother’s home, she observed that the house was unsanitary and the children were
dirty.  The daycare also reported that
the children came dirty and unwashed to daycare.  Dehart-Clark added, however, that the
children appeared healthy.  There is no
evidence that the children suffered from any illness, malnutrition or physical
abuse.  They did not suffer from diarrhea
or vomiting.  There is no evidence that
they ate contaminated food or that the mother’s house was infested with insects
or rodents.  There is no evidence that
the mother’s house lacked plumbing or drinking water.  

Further, the mother’s failure to comply
with the service plan was not due to indifference or malice toward her
children.  See Dearen, 715 S.W.2d at 367.  She has visited with her children while they
have been in the Department’s custody, contacted the Department many times
concerning the children, and made attempts to comply with the requirements of
the service plan since her husband moved out of the state.  Her children are bonded to her, and she has a
plan to raise the children with Jason who testified that he has agreed to
provide for them.  The children are
currently separated from each other in non-adoptive placement foster care.  Given the nature of the mother’s offending
behavior and the bond between her and her children, coupled with the children’s
uncertain future in regard to an adoptive placement, the factfinder could not
have reasonably formed a firm belief that terminating the parental rights of
the person with whom the children have the best chance of being a family
together, is in their best interest.  We
hold that the evidence adduced at trial is factually insufficient to support
the finding that termination of the mother’s parental rights is in their best
interest.         

Conservatorship of the Children

          Lastly,
the mother questions the legal and factual sufficiency of the evidence
supporting the appointment of the Department as the sole managing conservator
of the children.  She asks that she be
appointed sole managing conservator.  

The termination of parental rights and the appointment of a
non-parent as sole managing conservator are two distinct issues, requiring
different elements, different standards of proof, and different standards of
review.  Compare Tex. Fam. Code Ann. § 161.001 with Tex.
Fam. Code Ann. § 153.131(a) (West 2008); See also Earvin v. Dep't. of
Family & Protective Servs.,
229 S.W.3d 345, 351 (Tex. App.—Houston [1st Dist.] 2007, no pet.); In re
J.A.J., 243 S.W.3d 611,
615–17 (Tex. 2007); In re J.F.C.,
96 S.W.3d 256, 266 (Tex. 2002).  A
rebuttable presumption exists that it is in a child’s best interest for his
parents to be named his joint managing conservators.  Tex.
Fam. Code Ann. § 153.131(b) (West 2008). 
In order to rebut this presumption and appoint someone other than a
parent as sole managing conservator of the child, a court must find that
appointment of a parent would “significantly impair the child's physical health
or emotional development.”  Tex. Fam. Code Ann. § 153.131(a) (West
2008); In re J.A.J., 243
S.W.3d at 616.  Additionally, “[t]he best
interest of the child shall always be the primary consideration of the court in
determining the issues of conservatorship[.]” 
Tex. Fam. Code Ann. §
153.002 (West 2008).  

Unlike the standard of proof for termination of parental
rights, the findings necessary to appoint a non-parent as sole managing
conservator need only be established by a preponderance of the evidence.  Tex.
Fam. Code Ann. § 105.005 (West 2008); In re J.A.J., 243 S.W.3d at 616.  Likewise, the standard of review for the
appointment of a non-parent as sole managing conservator is less stringent than
the standard of review for termination of parental rights.  In re J.A.J., 243 S.W.3d at 616.  We
review a trial court’s appointment of a non-parent as sole managing conservator
for abuse of discretion only. Id.  (citing
Gillespie v. Gillespie,
644 S.W.2d 449, 451 (Tex. 1982)).  Therefore,
we reverse the trial court’s appointment of a non-parent as sole managing
conservator only if we determine that it is arbitrary or unreasonable.  Id. 
“Because different
standards apply, evidentiary review that results in reversal of a termination
order may not yield the same result for a conservatorship appointment.”  Id.

In Earvin, this court reversed the trial court’s
termination of a father’s parental rights, but affirmed the trial court’s
appointment of the Department as the sole managing conservator of the
child.  229 S.W.3d at 351.  In reversing the termination of the father’s parental
rights, we held that clear and convincing evidence did not support the trial
court’s determination that the father placed the child in conditions that would
endanger the physical and emotional well-being of the child or demonstrated an
inability to provide for the child.  Id.  However,
we also held that there was sufficient evidence that the father was not willing
to provide the child with an environment that was in the best interest of the
child.  Id. The Earvin court noted that the father failed to comply
with the court-ordered service plan by failing to attend parenting courses, to
submit to random drug tests, and to participate in counseling.  Id.  In addition, he had visited the child
only one time while she was in the Department’s custody.  Id.  Based on the evidence, the Earvin
court concluded that the trial court did not abuse its discretion in appointing
the Department as the sole managing conservator of the child.  Id.          

The facts here are similar to those
in Earvin.  Here, the Department originally took custody
of the children because of the mother’s neglect.  The children were living in hazardous and
unsanitary conditions, and they were dirty and unwashed.  The Department offered the mother services
and set up the family service plan to address her neglect.  The mother disregarded the services offered
and failed to complete the service plan, including completion of parenting
classes.  Evidence exists that Jason’s
house is clean and suitable for children. 
However, the mother does not have a legal right to reside there, and
Jason has no legal obligation to provide for the children.  The mother has no independent means to
support her children because she is unemployed and is not developing skills to facilitate
her employment.  When the mother was
asked what she would do if Jason told her to leave, she had no answer.  In addition, she remains legally married to
her husband and has refused to submit random drug tests.  The children are very young and therefore
need a caregiver who can reliably provide them with support.  No other relative was available to assume
care of these children.  For the
foregoing reasons, the trial court’s decision was not arbitrary or capricious
in determining that the appointment of the mother would not be in the
children’s best interest and would significantly impair their physical or
emotional development.  We affirm the
trial court’s judgment of conservatorship.      


Conclusion

We reverse the trial court’s
judgment terminating the mother’s parental rights and remand for a new trial.  We affirm the trial court’s order for
conservatorship of R.W., E.W., and B.W.

 

 

                                                                   Jane
Bland 

                                                                   Justice


 

Panel
consists of Justices Jennings, Bland, and Massengale.

 

 











[1]           The trial court also terminated her
husband’s parental rights.  He is not a
party to this appeal.   





[2]
          Because we have concluded that the evidence is
sufficient to support the trial court’s finding under section 161.001(1)(O),
and because a finding as to any one of the acts or omissions enumerated in
section 161.001(1) is sufficient to support termination, we need not address
the mother’s second issue challenging the trial court’s findings under section
161.001(E).  See In re 

A.V., 113 S.W.3d at 362.